### KELLNER *v.* MUTUAL LIFE INS. CO. OF NEW YORK.

*(Circuit Court, D. New Jersey.* September 23, 1890.)

1. PLEADING—FAILURE TO REPLY—EFFECT.
   Where a complainant makes no reply to the pleas filed by defendant, but sets them down for argument, the truth of all the facts stated in them and well pleaded is admitted, and no objection can be made to their form or regularity.

2. SAME—PLEA—SUFFICIENCY.
   A bill to ascertain the surrender value of a policy of insurance upon the life of complainant alleged that the principles and methods of the apportionment made by defendant of its surplus funds failed to award to complainant's policy the amount equitably due to it. *Held,* that a plea alleging that complainant agreed to ratify any plans adopted by the company for the equitable distribution of its surplus and profits was not an answer, for, if the methods adopted resulted in an inequitable division, as alleged, it was not the method complainant agreed to ratify.

3. LIFE INSURANCE—CONDITIONS OF POLICY—PAYMENT OF PREMIUMS.
   Where a life insurance policy is conditioned that, if the premiums be not paid when due, the consideration of the contract shall be deemed to have failed, and the company shall be released from all liability, a failure to perform the condition operates as a formal release to the company of all its liability under the policy, and precludes the policy-holder from any relief in equity by a bill for accounting.

4. SAME—RESCISSION.
   A claim that the non-payment of the premiums was simply a rescission by the policy-holder of the contract, induced by the discovery of alleged frauds on the part of the company, cannot be sustained, where it appears that he has had the benefit of an insurance upon his life for 10 years at a rate of premium fixed upon the hypothesis that the premiums would be paid for a much longer period.

In Equity. Bill to ascertain value of life insurance policy.

*B. A. Vail,* for complainant.

*J. B. Vrelenburgh* and *Robt. Sewell,* for defendant.

GREEN, J. The bill of complaint in this cause has for its prime object the ascertainment of the value of a policy of insurance taken by the complainant upon his own life in the year 1878, and surrendered, as the bill alleges, to the defendant corporation in 1888. The bill states the making of the contract of insurance by the complainant and the defendant, whereby, in consideration of the payment of $96.95 to the defendant corporation, and of the further payment, to be made at the office of the company, of the same sum on the 7th day of January and July in each year during the continuance of the contract, the defendant agreed that it would pay to the complainant on the 7th day of January, 1903,

the sum of $5,000, and, in the event of the complainant's death before that date, it would pay the said sum to his legal representatives. The bill further alleges that the complainant was entirely ignorant of the business of life insurance and the manner in which it was conducted, and that, although he saw the annual reports which were issued by the defendant after the execution of the said contract, he did not understand them, but, having confidence in the integrity of the officers and managers of the company, he accepted the reports and statements as true. That in 1887, however, he caused all the annual statements made by the company to be examined by persons skilled in the business of life insurance, and expert in the examination and analysis of the accounts appertaining thereto, and that, from the reports made to him by these skilled accountants, he charges, upon information and belief, that all the said annual reports so made by the defendant were untrue, fictitious, and made with the intention to deceive and mislead him. The bill then specifies with some particularity the alleged untruthfulness of the reports which had been examined by the experts, as, for instance, in paragraph 16 *et seq.* it is stated that the—

"Sworn reports of the defendant corporation showed that it had received in premiums from its insured members, from 1859 to 1888, inclusive, upwards of $323,000,000, and upwards of $100,000,000 of interest upon invested assets. That from the 1st day of January, 1879, to the 1st day of January, 1889, the amount of said premium receipts, as reported by said defendant corporation, exceeded the sum of $68,000,000 and $54,000,000 of interest income."

That in respect to these items, the complainant—

"Charges the truth to be that the said sums of money so reported as premium receipts for the several years during the term from 1866 to 1888, inclusive, are falsely reported; the sums so reported as premium receipts during those years covering and embracing large sums of money which were received in the year prior to that of which the report was made, and being already in the hands of the said defendant corporation either as invested assets or as deposit in banks."

The complainant further charges the truth to be, in this respect—

"That the sums so falsely reported as premium receipts exceeded the sum of $143,000,000. That this sum, so falsely reported as premium income, was made up and consisted of dividends, declared and surrendered values, reported as premium receipts, when in fact and in truth a large part thereof had been appropriated to the payment of surrendered values and dividends to policy-holders."

Various other allegations of the untruthfulness of the annual reports are made, chiefly consisting in charging or crediting one account with large sums of money which rightfully and properly should have been charged or credited to other accounts, and the bill then states- -

"That the purpose and intention of the said defendant corporation, in thus fictitiously and falsely disposing of its premium income and amount of new business issued and amount of business canceled, was to make a false and deceptive showing of its business for the purpose of deceiving the complainant and other members of said corporation and the insuring public, and concealing the true state and condition of its affairs."

And, further—

To create false and fictitious ratios of expense to actual premium income, such as would show to the complainant and the insuring public that its affairs were economically administered, when in truth and fact the expenses of the defendant corporation were of far greater proportion to its actual premium income than they should have been."

The bill then alleges that, upon being informed of the manner in which the defendant was conducting its business, the complainant discovered that the result was to defraud him and the other members out of the equitable share of the surplus and profits due to them under the provisions of the charter of the company. That thereupon the complainant demanded an accounting should be made upon his policy of insurance, and he be paid by the defendant the equitable cash surrender value thereof, which the defendant refused to do at that time, but in August, 1888, did offer the complainant $850 as the full value of his policy. That this sum the complainant refused, insisting that such value exceeded $3,000, and thereupon he filed his bill of complaint.

The prayer of the bill is for an account to be taken of all the business and transactions of the company from the 1st day of January, 1878, to and including the 21st day of December, 1888, and that the defendant be decreed to pay to the complainant the full, fair, and equitable surrender value of his policy, and for other relief. To this bill of complaint the defendant has, by leave of the court, interposed four special pleas, and, in pursuance of the requirements of the thirty-second rule in equity, has fortified the pleas with an answer denying explicitly the fraud specially charged in the bill; that the complainant was induced to enter into the contract of insurance by false and fictitious statements made by the defendant; and also denying that the complainant ever surrendered his contract or policy, or that the defendant ever accepted such surrender, or that it ever offered to pay the sum of $850, or any other sum, as the full and equitable value of the complainant's policy, or for any other object or purpose whatever. The pleas, stripped of their legal and formal verbiage, are practically as follows:

"(1) That in making application for the policy, the complainant, in writing, agreed that the contract about to be entered into between himself and the defendant was to be in all respects construed and interpreted under and by virtue of, and in accordance with, the law of New York, the place of the contract being expressly agreed to be the principal office of the company in the city of New York; that by the policy the conditions of the application became a part of the contract, and could not be waived except by formal release; that they were in fact never waived; that the contracts of the defendant company made with other policy-holders, in all respects similar to the one made with the complainant, have been construed by the highest court in the state of New York, and by that court it has been held that no relationship of trustee and *cestui que trust* exists between the parties by virtue of the contract; that the policy-holder has a full, complete, and adequate remedy at law for any breach of the contract made with him, and cannot claim relief in equity by a bill for an accounting. (2) That the contract in question was broken by the complainant, and, by its terms, forfeited by his repeated defaults in payment of premium due before the commencement of this suit, and thereby the de-

fendant was released from all liability under it. (3) That there is no provision in charter or in the contract of insurance to pay to a policy-holder any money upon the surrender of the policy, but such payment is forbidden. (4) The complainant has agreed to ratify and accept any plan adopted by the company for the equitable distribution of its surplus and profits."

The bill and pleas were set down for hearing under the thirty-third rule in equity. As the complainant has made no reply to the pleas, but set them down for argument, the truth of all facts stated in them and well pleaded is admitted. *Farley* v. *Kittson*, 120 U. S. 303, 7 Sup. Ct. Rep. 534. Nor can the complainant take any exception to the regularity or form of the pleas. If he desired to dispute either, he should have filed exceptions. Fost. Fed. Pr. § 203. *Suydam* v. *Johnson*, 16 N. J. Eq. 112.

The only question now to be considered relates solely to the sufficiency of the pleas, in point of law, as a bar to the complainant's action. If they or either present a valid defense, the bill of complaint must be dismissed. The last plea stated above is intended as an answer to the charge of the bill that the profits and surplus moneys of the company have been falsely, unfairly, and inequitably apportioned or divided by the company, to the loss of the complainant. It alleges, in substance, that the complainant agreed, in advance of such apportionment or distribution, to accept and ratify the principles and methods adopted by the company in such distribution, and in its determination of the amount equitably due or belonging to his policy. But the complainant charges that the principles and methods of the division or apportionment made by the company of its surplus funds fails in that very particular of awarding to his policy the amount equitably due to it. It is evident upon the mere statement of the charge that the plea is not an answer. Admitting that the complainant did in advance ratify the plan thereafter to be adopted by the company in distributing its surplus among policy-holders, which would give to his policy its equitable share, it is quite clear that he assented to nothing more. The plan which he ratified, if there could be, under these circumstances, such a precedent ratification of a method thereafter to be originated, was such as would give him his equitable share. The method of distribution and the share of surplus were inseparably connected, as cause and result. If the method resulted in an inequitable division, then it follows that the method adopted was not the method which the complainant agreed to ratify. The charge in the bill of complaint is that such was the result of the principles and methods adopted. Hence it is no answer to say that the complainant ratified some other principle or method of distribution. This plea is overruled.

The plea of the defendant, by it secondly pleaded, raises a very serious question. In effect, it avers that the complainant has no right of action against the defendant, because he voluntarily failed or refused to pay to the defendant the semi-annual premiums due, according to the terms of the contract of insurance, on the 8th day of January and 7th day of July, 1889, before the commencement of his suit; that this de-

fault worked not only a forfeiture of the contract of insurance, but as well defeated and made void all obligations of the defendant arising under that contract; and that the contract thereby became, by its very terms and the force of its conditions, null and absolutely void, and thereafter had no existence in fact. These facts are well pleaded, and are to be taken as true. It is difficult to see how the complainant, under these circumstances, has any standing in court. The business of life insurance is *sui generis.* It differs widely from fire insurance, and is controlled by principles essentially variant from those which limit the latter. Briefly stated, it may be said to rest upon the operation of two distinct, yet closely connected, factors, — the average expectation of life and the cumulative power of interest compounded. In other words, the two somewhat uncertain elements which life insurance seeks to reduce to the precision and certainty of a mathematical proposition are the average length of life accorded to a thoroughly well man, on the one hand, and the earning capacity, for a certain definite term of years, of a certain sum of money to be paid certainly on a fixed date during that life, on the other. It is by the skillful use of these two factors that life insurance corporations are enabled to fix and determine, as the very foundation of their business, the sum of money or premium which must be paid by the insured to them, as a just consideration for their contract of insurance; to enable them, in fact, to fulfill, honestly and promptly, their part of the contract. It is perfectly clear, therefore, that promptness of payment of such yearly premium, when fixed at the times designated for such payment, is necessary and absolutely essential to the honest conduct of life insurance. If there be uncertainty as to such payment of premium, all calculations based upon its prompt and certain receipt must be seriously disturbed, if not radically destroyed, resulting, finally and surely, in the disastrous collapse of the entire business scheme. And it is because of this that the courts, both United States and state, have, almost without exception, held that in a contract of life insurance the condition of payment of premium on a certain fixed date is of its very essence; and if the contract provides, as a penalty for the breach of such condition, that it shall thereupon become null and void, and all payments theretofore made shall be forfeited to the company, equity will not afford any relief. This principle is stated very strongly by Mr. Justice BRADLEY, in delivering the opinion of the court in *Insurance Co.* v. *Statham,* 93 U. S. 24. He says:

"It must be conceded that promptness of payment is essential in the business of life insurance. All the calculations of the insurance company are based on the hypothesis of prompt payments. They not only calculate on the receipt of the premiums when due, but on compounding interest upon them. It is on this basis that they are enabled to offer assurance at the favorable rates they do. Forfeiture for non-payment is a necessary means of protecting themselves from embarrassment. Unless it were enforceable, the business would be thrown into utter confusion. It is like the forfeiture of shares in mining enterprises, and all other hazardous undertakings. There must be power to cut off unprofitable members, or the success of the whole scheme is endangered. The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each

is interested in the engagements of all, for out of the co-existence of many risks arises the law of average, which underlies the whole business. &ast; &ast; &ast; Delinquency cannot be tolerated or redeemed except at the option of the company. &ast; &ast; &ast; When no stipulation exists, it is the general understanding that time is material, and that the forfeiture is absolute if the premium be not paid. &ast; &ast; &ast; The case, therefore, is one in which time is material, and of the essence of the contract. Non-payment at the day involves absolute forfeiture, if such be the terms of the forfeiture. Courts cannot, with safety, vary the stipulation of the parties by introducing equities for the relief of the assured against their own negligence."

The same principle was asserted in *Klein* v. *Insurance Co.*, 104 U. S. 88. In this case it was held by the court that a condition in a policy of life insurance that if the stipulated premium shall not be paid on or before a certain day the policy shall cease and determine is of the very essence of the contract, and that a court of equity could not afford any relief against a forfeiture caused by a failure to pay the premium at the time fixed. Mr. Justice Woods, in delivering the opinion of the court, says:

"A life insurance policy usually stipulates—*First*, for the payment of premiums; *second*, for their payment on a day certain; and, *third*, for the forfeiture of the policy in default of punctual payment. Such are the provisions of the policy which is the basis of this suit. Each of these provisions stands on precisely the same footing. If the payment of the premiums, and their payment on the day they fall due, are of the essence of the contract, so is the stipulation for the release of the company from liability in default of punctual payment. No compensation can be made a life insurance company for the general want of punctuality on the part of its patrons. &ast; &ast; &ast; If the assured can neglect payment at maturity, and yet suffer no loss or forfeiture, premiums will not be punctually paid. To hold a company to its promise to pay the insurance notwithstanding the default of the assured in making punctual payment of the premiums is to destroy the very substance of the contract. This a court of equity cannot do."

The issue raised by the plea which is now being considered seems to bring this case directly within the rulings of the cases cited. The contract into which the complainant entered with the defendant, after providing for the payment of a certain fixed sum or premium upon a certain day named, contains this condition:

"If any premium, or installment of a premium, on this policy shall not be paid when due, the consideration of this contract shall be deemed to have failed, and the company shall be released from all liability."

It is an admitted fact that, previous to the commencement of this suit for an accounting upon his policy, the complainant had voluntarily made default in the payment of premiums, which were due, respectively, on the 7th day of January and the 7th day of July, 1889. Clearly the complainant has failed to perform the condition by which his contract was to be kept alive and in force. That failure compassed the death of his policy of insurance, and as well operated as a formal release to the company of all liability that then existed or could arise under it. By his own act he destroyed the contract which he now seeks partly to enforce. How can a non-existent contract, if there can be such a thing,

have any value, pecuniary or otherwise? Or, if this contract can be said to have value, how can it be in any sense an obligation of the defendant, to whom the complainant has given a full release from all liability arising under or out of it? The only answer which is made on behalf of the complainant to the defendant in this behalf is that the complainant's failure to pay the premium when due was a simple rescission by him of the contract, induced by the discovery of the alleged frauds, set out in the bill of complaint, which rescission did not affect any right theretofore accrued to him under the policy. That fraud in the inception of a contract will justify and authorize a rescission is well settled. But it is equally well settled that a contract cannot be rescinded unless the parties thereto can be restored to the same condition in which they were when the contract was made. It is apparent from the nature of the contract into which these parties entered that this cannot be done. For a period of 10 years, or thereabouts, the life of the complainant has been insured for a large sum of money by the defendant. Such obligation of assurance has been a burden upon, and borne by, the defendant, for which it has received no adequate, or, at least, no fairly adjusted, compensation. The rate of annual payments by the complainant to the defendant was fixed and determined upon the hypothesis that the premiums would be paid, without interruption or failure, for a much longer term than 10 years. For an insurance secured by a contract which is to terminate in 10 years a much larger annual premium would be required and demanded than for one which is to terminate in 25 years, which was the life of the contract in question. Hence it is apparent that for a period of 10 years the complainant has had the benefit of an insurance upon his life at a rate of premium much lower than the risk fairly and honestly required, and which rate has been made too low by his own act of alleged rescission. In other words, if he has worked a rescission of the contract, in the legal acceptation of that term, instead, thereby, of restoring the defendant to the condition in which it was at the time the contract was entered into, he has compelled it to assume the burden of a contract from which before it was entirely free, for which it has received no adequate consideration, and which, by his act, has, in a most important particular, been rendered wholly variant from the contract into which the complainant and the defendant actually did enter.

The default of the complainant cannot operate as a legal rescission of the contract upon his part. Its legal effect was to cause a willful breach of a condition, thereby working a forfeiture of the contract by its very terms, and releasing the defendant from all liability under it, The plea, therefore, raises a complete bar to the action of the complainant, and upon it the defendant must have judgment. This conclusion renders it unnecessary to consider the questions raised by the other pleas.